UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TAJAMALA LESTER,<br><br>              Plaintiff,<br><br>       v.<br><br>U.S. ROCHE HEALTH AND WELFARE BENEFITS VEBA PLAN,<br><br>              Defendant. | Case No. 19-cv-01490-EMC<br><br>**ORDER DENYING PLAINTIFF'S MOTION FOR JUDGMENT AND GRANTING DEFENDANT'S CROSS-MOTION FOR JUDGMENT**<br><br>Docket Nos. 38, 39 |

## I.   INTRODUCTION

Plaintiff Tajamala Lester brought this lawsuit after her long-term-disability benefits were cancelled following a finding by the plan administrator, Liberty Life Insurance Company of Boston ("Liberty"). The plan is funded by U.S. Roche Health and Welfare Benefits Veba Plan ("Roche"). After Ms. Lester initially became disabled, Roche provided her with short-term-disability benefits. When the short-term benefits expired, Roche began paying Ms. Lester long-term benefits. However, once Liberty determined that Ms. Lester was no longer disabled, Roche terminated her benefits altogether. Ms. Lester disputed Liberty's finding, but Liberty upheld the decision on appeal. This lawsuit followed. Both parties now seek judgment in their favor under Federal Rule of Civil Procedure 52.

For the reasons discussed below, this Court **DENIES** Ms. Lester's motion for judgment; the Court **GRANTS** Roche's motion for judgment in its favor because the decision to terminate Ms. Lester's benefits was not arbitrary and capricious.

## II. BACKGROUND

A. Factual Background

The following facts are pled in Ms. Lester's operative complaint. Ms. Lester worked for Genentech. Docket No. 10 ("FAC") at ¶ 5. When she began her employment, she considered the work "difficult and challenging" and "she found the job to be drastically different from what she expected[.]" *Id*. According to the FAC, this work environment caused her "serious health concerns" such as depression, anxiety, pneumonia, insomnia, and cognitive decline. *Id*. ¶¶ 5–6.

Because of these psychological and physical manifestations, on September 7, 2017, Ms. Lester went on leave at the advice of her doctor. *Id*. ¶¶ 6–7. During this leave, she was "disabled and unable to work as a result of major depressive disorder, generalized anxiety, and . . . mild cognitive impairment." *Id*. ¶ 11. Roche paid Ms. Lester short-term-disability ("STD") benefits from October 2, 2017 to March 5, 2018. *Id*. ¶ 12.

At the expiration of her STD benefits, her condition improved such that she could return to work, but she maintained that, pursuant to the terms of Roche's Long-Term-Disability Plan (the "Plan"), she was unable to return to her "own occupation." *Id*. ¶ 8. Accordingly, Roche awarded Mr. Lester long-term-disability ("LTD") benefits beginning March 5, 2018, for a maximum 24-month period. *Id*. However, on October 19, 2018, Liberty determined that Ms. Lester was no longer disabled within the meaning of the Plan and ceased paying her LTD benefits retroactively from September 30, 2018. *Id*. ¶ 13.

B. Administrative And Procedural Background

On December 31, 2018, Ms. Lester sought review of Liberty's finding. *Id*. ¶ 14. As part of the review process, Ms. Lester's medical records were examined by medical reviewers retained by Liberty. *Id*. ¶ 15. Liberty subsequently denied her appeal by "determining that there was insufficient 'diagnostic' testing to support her disability." *Id*.

Ms. Lester claims that Liberty erroneously made this determination notwithstanding her reporting of continued symptoms, no improvement in cognitive abilities, and that she was "unable to repeat her neuropsychological evaluation within less than a year from the prior testing." *Id*. ¶ 16. Ms. Lester maintains that she continues to be disabled and is entitled to LTD benefits under

the Plan.  *Id*. ¶ 17.

Ms. Lester filed her complaint on March 22, 2019.  Docket No. 1.  She filed an amended complaint on April 11, 2019.  Docket No. 10.  On March 5, 2020, Ms. Lester moved for judgment in her favor under Federal Rule of Civil Procedure 52.  Docket No. 38 ("Lester Mot.").  Roche filed its cross-motion for judgment on March 26, 2020.  Docket No. 39 ("Roche Mot.").

### III.     LEGAL STANDARD

The Plan administered by Liberty is governed by the Employee Retirement Income Security Act ("ERISA").  A participant in an ERISA plan may bring a civil action to recover benefits, to enforce rights, or to clarify future rights under the terms of the Plan.  The default standard to ERISA review is *de novo*, unless the Plan grants the plan administrator discretion.  *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1095 (9th Cir. 1999).  Here, the Plan affords Liberty such discretion, so the abuse-of-discretion standard applies.[1]  If a structural conflict exists, however, then the Court cannot rely solely on any reasonable basis in affirming the plan administrator's decision.  *See Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 673 (9th Cir. 2011).  The parties agree that no structural conflict exist.

Thus, in the absence of a conflict, judicial review of a plan administrator's benefits determination involves a straightforward application of the abuse-of-discretion standard.  *Montour v. Hartford Life & Acc. Ins. Co*., 588 F.3d 623, 629–30 (9th Cir. 2009) (citing *Boyd v. Bert Bell/Pete Rozelle NFL Players Ret. Plan*, 410 F.3d 1173, 1178–79 (9th Cir.2005)).  Although Ms. Lester contends one of the medical reviewers relied upon by Roche was financially biased, she does not contend there was any structural conflict of interest on the part of the plan administrator, Liberty.  "[W]here there is no risk of bias on the part of the administrator, the existence of a 'single persuasive medical opinion' supporting the administrator's decision can be sufficient to affirm, so long as the administrator does not construe the language of the plan unreasonably or render its decision without explanation.  *Id*. (citing  *Boyd*, 410 F.3d at 1179).  "In these

---

[1] Here, the parties are in accord that California Insurance Code section 10110.6(a)—which voids policies that reserves discretionary authority to the insurer to determine eligibility—does not apply because the Plan is self-funded by Roche, not Liberty.

2

circumstances, the plan administrator's decision can be upheld if it is 'grounded on **any** reasonable basis.'" *Id*. at 629 (quoting *Sznewajs v. U.S. Bancorp Amended & Restated Supplemental Benefits Plan*, 572 F.3d 727, 734–35 (9th Cir. 2009)) (emphasis in original). Stated differently, the decision may be upheld if it is not "(1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from the facts of the record." *Salomaa*, 642 F.3d at 676 (quoting *United States v. Hinkson*, 585 F.3d 1247, 1262 (9th Cir. 2009)).[2]

## IV. DISCUSSION

Both parties move for judgment under Rule 52. Ms. Lester argues that Roche abused its discretion when it terminated her benefits after Liberty denied her claim and found that she was not disabled under the Plan. Specifically, she makes two arguments: (1) Liberty laid out a definition for "disabled" that was impossible to satisfy; and (2) Liberty hired medical reviewers who failed to independently and properly analyze her cognitive impairment. Roche maintains that its decision to terminate benefits was appropriate, and Liberty's finding was supported by the record.

### A. The Plan's Standard for Demonstrating Disability

Ms. Lester protests the Plan's "impossible" standard for demonstrating disability. Lester Mot. at 8. She argues that Liberty's rationale for terminating her benefits was because she failed to present a more-recent neuropsychological examination, after submitting one in February 2018. *Id*. She contends it was impossible for her to provide a new examination within twelve months of her last exam (February 2018). *Id*. Roche responds that Liberty's finding was not based on the absence of an updated exam, nor is there any evidence in the record that she was barred from repeating a neuropsychological exam within a twelve-month period. To the contrary, it argues that the decision was based on a review of all her medical records and information, which revealed that she was not disabled within the meaning of the Plan.

---

[2] While Ms. Lester's brief argues that, under *Kearny*, this Court must evaluate the persuasiveness of conflicting testimony and decide which is more deserving of credence, *Kearny* ultimately applied the *de novo* standard of review, so it does not govern here. *See Kearny*, 175 F.3d at 1090 ("Thus we conclude that the district court was correct in its determination that Mr. Kearney's claim should be reviewed *de novo*.").

2

1    Under the Plan,

2    > ***Disability or Disabled*** means you (a) are unable to perform the Material and Substantial Duties of your Own Occupation due to your Sickness, pregnancy, or Injury; (b) have 20% or more loss in your Indexed Monthly Earnings due to that Sickness, pregnancy, or Injury; and (c) are under the Regular Care of a Doctor for that Sickness, pregnancy, or Injury. After 24 months of receiving LTD benefits, however, you will be considered "Disabled" only if you are unable to perform the duties of any Gainful Occupation for which you are reasonably fitted by education, training or experience due to that same Sickness or Injury. The loss of a professional or occupational license or certification does not, in itself, constitute a Disability."

Docket No. 40 ("Odgaard Decl."), Ex. B at ROCHE000119 (emphasis in original). "***Own Occupation*** means the Covered Person's occupation that he was performing when his Disability or Partial Disability began. For the purposes of determining Disability under this policy, Liberty will consider the Covered Person's occupation as it is normally performed in the national economy." *Id*. at ROCHE000121 (emphasis in original). Additionally, under the Plan, "***Sickness*** is any disorder of your body or mind, but excluding any Injury, pregnancy including abortion, miscarriage or childbirth." *Id*. at ROCHE000121 (emphasis in original). Finally, "***Injury*** is a bodily injury that is the direct result of an accident not related to any other cause." *Id*. at ROCHE000120 (emphasis in original).

As stated above, Ms. Lester began receiving LTD benefits on March 6, 2018. In a letter confirming Ms. Lester LTD benefits eligibility for a 24-month maximum period, Liberty also stated that it "will continue to review your claim and request medical documentation to evaluate your continued eligibility for benefits. Please note that approval at this time does ***not*** guarantee payments through the maximum benefit duration." *Id*., Ex. I at ROCHE000867 (emphasis added).

As Ms. Lester correctly notes, "[c]onditioning an award on the existence of evidence that cannot exist is arbitrary and capricious." *Salomaa*, 642 F.3d at 678. However, nothing from Liberty's initial decision or subsequent decision on appeal indicates—expressly nor impliedly—that it was conditioned on Ms. Lester's requirement to submit a repeat examination (which, according to Ms. Lester, she could not take). Further, this Court is unable to find anything in the record that demonstrates Ms. Lester was unable to participate in a follow-up neuropsychological

2

examination; indeed, at the hearing, counsel for Ms. Lester simply stated—without record support—that a 12-month bar on neuropsychological re-evaluation was an industry standard. Thus, nothing in the Plan or Liberty's denial indicates that an impossible standard was applied. As explained below, Liberty instead relied on Ms. Lester's medical reports, as well as independent medical reviewers' opinions to conclude that she was able to return to work.

B.  Liberty's Review of Ms. Lester's Medical Records

Ms. Lester argues that Liberty's medical reviewers were biased (because they were retained by Liberty) and failed properly to recognize her cognitive impairment. Roche, on the other hand, contends that Liberty's review of Ms. Lester's medical reviews was thorough and independent, and supports the finding that she could return to work.

In reviewing the reasonableness of the administrator's determination, the Court should consider factors such as the quality and quantity of the medical evidence, whether the plan administrator commissioned an in-person medical review or simply relied on the claimant's existing medical records, whether the administrator provided its independent experts with all relevant evidence, and whether the administrator considered a contrary disability determination by the Social Security Administration. *Montour*, 588 F.3d at 630 (citing *Metro. Life Ins. Co. v. Glenn*, 554 U.S.105, 118 (2008)). To the extent the party challenging the determination contends there was a conflict, "the party claiming a conflict . . . [must] produce evidence of a financial conflict sufficient to warrant a degree of skepticism." *Demer v. IBM Corp.*, 835 F.3d 893, 902 (9th Cir. 2016)

1.  Ms. Lester's Job Title and Responsibilities

Ms. Lester's job title at Genentech was Market Analysis and Strategy Manager. *See* Odgaard Decl., Ex. D (job description). She began working for Genentech in this position on September 5, 2015, until her termination on September 11, 2018. As relevant here, Ms. Lester's job duties that required cognitive performance were as follows:

> Responsible for providing analysis, synthesis, providing guidance for commercial, medical and government affairs, acting as a strategic advisor, leveraging market expertise, applying technical expertise to simplify complexity and influencing key patient, building and applying high foundational knowledge, proactively

2

> accounting for market research impact, contributing foundational skills, understanding competitive drivers and developing competitive strategies, leading competitive threat assessment to develop rigorous team assumptions, reading group and assessing team needs, leadership, partner and collaboration, resource planning, meetings, travels, up to 20–25% travel, regularly contributing to knowledge management capabilities, regularly assessing partnership and quality of work. This position requires to be flexible during normal working hours as required by the team and weekend required during congress travel.

*Id*. at Ex., M.

According to the record, Liberty made its finding that Ms. Lester was not disabled based on her medical records, reports from her treating physicians, and reports from reviewing physicians that were hired by Liberty. The record reveals the following medical evidence regarding Ms. Lester's disability status and her ability to return to her own occupation as a Market Analysis and Strategy Manager.

    2.    <u>Ms. Lester's Treating Physicians</u>

        a.    <u>Dr. Nancy Canning Psy.D (neuropsychology)</u>

In February 2018, Ms. Lester's treating neuropsychological physician, Dr. Nancy Canning, Psy.D., created a report based on two neuropsychological examinations administered in that same month. Docket No. 38-1 ("Benham-Baker Decl."), Ex. 4. Dr. Canning's report begins by explaining that Ms. Lester was "referred by her PCP to evaluate her cognitive and emotional status after a nearly 6 month leave of absence from work due to onset of severe depression and anxiety in September 2017." *Id*. The referral was made by Dr. Nishi Bhopal, one of Ms. Lester's treating physicians. This was Ms. Lester's first and only time being evaluated by Dr. Canning. Ms. Lester points to Dr. Canning's notes indicating that she had a "significant decrease in performance in most domains of functioning." *Id*. at 5. Specifically as to Ms. Lester's cognitive ability, the report found:

> Word finding difficulties. Per manager, using more "general" instead of specific language of biotech field. She was using the notes function in PowerPoint presentations to help cue herself, but she tended to actually read the notes instead of speaking spontaneously (also commented on by supervisor). Trouble navigating to familiar places. Problems focusing and sustaining attention, including during reading that results in reduced carryover. Decreased organization and decision making skills. Also per manager's annual reviews, in 2016 noted decreased carryover, and

2

> in 2017 noted that the patient had difficulty applying learning and generalizing from details. She also has been noted in conversation and presentations to reply with non-sequiturs. She apparently was advised that she would first have to excel in her current position before moving upward in the organization.

*Id*. Dr. Canning's findings go on to state:

> Speed of information processing was notably slowed. Visuospatial skills and performance on all tasks that could not be verbally mediated was very poor. She had a great deal of difficulty organizing and integrating information. She failed to implement learning strategies that might have improved her long term recall. Her level of errors across the evaluation was very high. When she completed self report inventories on symptoms of anxiety and depression, I asked her to rate her symptoms both several months ago and currently. She reported great reduction in her symptoms and thought she was close to baseline. Although insight into her emotional functioning is quite limited, depression and/or anxiety alone would not account for her pattern or performance.

*Id*. Ms. Lester performed a number of cognitive assessments with an ultimate scorecard of forty-three (43) categories. In these categories, she scored "High Average" six times; "Average" fifteen times; "WNL" (*i.e.*, within normal limits) five times; "Low Average" eleven times; "Mildly Impaired" four times; and "Impaired" two times.[3] *Id*. As a result, Dr. Canning recommended that Ms. Lester "should not return to work until she has been worked up for differential diagnosis of neurological versus metabolic versus psychiatric etiology." *Id*. Moreover, she recommended that Ms. Lester "should work with her medical team to assess her readiness to return to work at this time, and particularly to the same work environment pre-major depressive episode. If she does return to her position, it should be on a paced schedule to gradually work back up to the demands of full time employment after a 6-month leave. We discussed starting with 4 hours per day 3 days a week (M-W-F, not consecutive days)."

Although Dr. Canning conducted a neuropsychological exam of Mr. Lester, the February

---

[3] Dr. Canning's findings are based on Ms. Lester's performance on the following clinical tests: Animal Naming, Beck Anxiety Inventory, Beck Depression Inventory-II, California Verbal Learning Test-II, Controlled Oral Word Association Test, Dot Counting Test, Finger Tapping Test, Grooved Pegboard Test, Hooper Visual Organization Test, Judgment of Line Orientation, Naming subtest from Neuropsychological Assessment Battery, Paced Serial Attention Test (Rao version), Rey 15-Item test, Rey Complex Figure Test, Ruff 2&7 Selective Attention Test, Ruff Figural Fluency Test, Sensory Perception Exam, Trails A & B, select subtests from the Wechsler Adult Intelligence Scales-IV, and Wechsler Memory Scales-IV, and Wisconsin Card Sorting Test.

2

1    2018 examination did not measure Ms. Lester's cognitive symptoms against her job duties.  The
2    only analysis of job-readiness are two notations relate to comments from Ms. Lester's manager at
3    Genentech:  (1) "[p]er manager, using more 'general' instead of specific language of biotech field.
4    She was using the notes function in PowerPoint presentations to hep cue herself, but she tended to
5    actually read the notes instead of speaking spontaneously"; and (2) "[a]lso per manager's annual
6    reviews, in 2016 noted decreased carryover, and in 2016 noted that [Ms. Lester] had difficulty
7    applying learning and generalizing from details.  She has been noted in conversation and
8    presentations to reply with non-sequiturs.  She apparently was advised that she would first have to
9    excel in her current position before moving upward in the organization." *Id*.

10   In sum, Dr. Canning does not definitively state that Ms. Lester is unable to work, nor does
11   Dr. Canning declare that Ms. Lester is disabled from working her then current job.  While the
12   February 2018 exam documents some cognitive-impairment symptoms, the ultimate
13   recommendation is that Ms. Lester receive a differential diagnosis of the cause of problems before
14   going back to work and that she "work with her medical team to assess her readiness to return to
15   any work at this time" (*id*.);  Dr. Canning does not say she is not capable of working.

16       b.  <u>Dr. Nishi Bhopal (psychiatry and sleep medicine)</u>

17   Ms. Lester's identifies Dr. Nishi Bhopal as one of her treating physicians.  Mot. at 7 ("The
18   ***key*** treaters for this case are Dr. Nishi Bhopal, who is board certified in psychiatry and sleep
19   medicine . . . .") (emphasis added).  However, in her reply brief, Ms. Lester argues that Liberty's
20   decision to only contact Dr. Bhopal telephonically was erroneous, because "Dr. Bhopal, a
21   psychiatrist and sleep medicine specialist, was ***not*** Ms. Lester's primary treater for cognitive
22   impairment." Docket No. 42 ("Lester Reply") at 6 (emphasis added).  She does not explain this
23   inconsistency.  In support of her appeal, Ms. Lester only attaches one medical opinion from Dr.
24   Bhopal:  on December 10, 2018 (*i.e.*, ***after*** Liberty found Ms. Lester was no longer disabled, but
25   before the appeal process), Dr. Bhopal penned a letter stating that she was "aware that Ms. Lester
26   has been diagnosed with a Mild Cognitive Impairment, iron deficiency/anemia, and uterine
27   fibroids.  She is being treated for these conditions primarily by ***other physicians***." *Id*. (emphasis
28   added).  Notwithstanding Dr. Bhopal indicating that she was not treating Ms. Lester for cognitive

United States District Court
Northern District of California

2

impairment, her letter continues to opine on such condition. She states that "[h]er cognitive issues . . . continue." *Id*. Dr. Bhopal also acknowledged that Ms. Lester "had neuropsychological testing in February 2018. When we saw such improvement with Ms. Lester's depression and anxiety but stagnant cognitive problems we thought something else must be going on . . . . [¶] Because the cognitive impairment appears to be separate and unrelated to the mood disorders, any improvement in the mood disorders would not necessarily lead to a corresponding improvement in cognitive function." *Id*. Notably, Dr. Bhopal did ***not*** diagnose Ms. Lester with cognitive impairment. Instead, Dr. Bhopal's letter states, "I have diagnosed her with Major Depressive Disorder (MDD), single episode, with a rule-out of recurrent depression. Ms. Lester's MDD is currently in partial remission. I have also diagnosed her with Generalized Anxiety Disorder (GAD). Additionally, I have diagnosed her with Delayed Sleep Phase Syndrome, a circadian rhythm disorder." *Id*. It does not describe cognitive impairments, nor does she clearly opine she is disabled from working in her occupation.

Indeed, Roche's motion, however, provides the Court with additional medical documentation from Dr. Bhopal that suggests Ms. Lester could return to work under certain conditions. On December 17, 2017, Dr. Bhopal signed a "Return to Work Release Form" with a February 5, 2018 as the indicated date on which Ms. Lester was able to return to work. Odgaard Decl., Ex. T. This form recommends that Ms. Lester "[r]eturn on reduced schedule of 3 days/week for weeks 1 & 2, then 4 days/week for weeks 3 & 4, then full time by week 5. *Id*. Then, on February 6, 2018, Dr. Bhopal provides further recommendations: "[r]ecommended return to work date of March 5, 2018" and "[i]t is recommended that she be assigned to a different role (business-oriented) either within or outside of her current department." *Id*. Lastly, on August 2, 2018, Dr. Bhopal provides an update on Ms. Lester's ability to return to work:

> We have been working on implementing a comprehensive treatment plan to optimize her health and wellness and to facilitate her return to work. As part of her treatment plan, it is recommended that she engage in career coaching with an executive coach. The desired outcomes of career coaching are to learn how to accurately assess her strengths and weaknesses, learn how to use her skills and talents effectively at work, learn stress management techniques that are relevant to working in the corporate world, and learn how to maintain a sustainable approach to work.

2

*Id.*, Ex. G.

The parties dispute whether Dr. Bhopal's opinions regarding Ms. Lester's readiness to return to work demonstrate that she is able to perform her own occupation in accordance with the Plan. On the one hand, Ms. Lester argues that the definition of "Own Occupation" in the Plan does not speak to with or without accommodations, and neither of Ms. Lester's treating physicians indicated that she could return to work without restrictions. On the other hand, Roche argues that the recommendations that Ms. Lester return to work on a reduced schedule suggests that she could perform her job functions. Moreover, Roche contends that Dr. Bhopal's recommendation that Genentech place Ms. Lester in a "business-oriented" role supports its argument that she was able to do her job; this is so because a Genentech accommodation specialist stated that Ms. Lester was "already in an extremely business oriented role." *Id.*, Ex. W.

        c.     <u>Dr. Matthew Arnold, MD</u>

On March 13, 2018, Ms. Lester saw Dr. Matthew Arnold for an MRI. *Id.*, Ex. K. Dr. Arnold noted that "[a]nxiety and depression . . . may contribute to some of her cognitive problems . . . ." *Id.* He also concluded that there was "[n]o acute intracranial abnormality or acute infarct. No abnormal enhancement of the brain leptomeninges." *Id.* Indeed, Ms. Lester characterizes Dr. Arnold's findings on white matter abnormalities as "inconclusive." Lester Reply at 5.

    3.     <u>Liberty's Medical Reviewers</u>

        a.     <u>Dr. Pei Nie, M.D.</u>

Liberty hired medical file reviewers to access Ms. Lester's disability status. Specifically, Dr. Pei Nie reviewed Ms. Lester's medical records on October 9, 2018. Benham-Baker Decl., Ex. 7. Dr. Nie began by reviewing Ms. Lester's medical documentation beginning from November 15, 2017 through August 3, 2018. *Id.* Dr. Nie also spoke with Ms. Lester's treating physician, Dr. Bhopal, on a peer-to-peer call and reviewed a note dated April 13, 2018, wherein Dr. Bhopal opined that Ms. Lester "has been starting to feel better, trying to keep her apartment clean, spending more time with friends, and feeling optimistic." *Id.*

Dr. Nie was posed with the following question: "Do the medical records reasonably support that [Ms. Lester] has impairments attributable to the presence of mental illness that would

2

preclude her from carrying out [her] usual life activities, including work related activities?" *Id.* In response, Ms. Nie opined that,

> Although [Ms. Lester] reports being impaired by mental illness, with complaints of fatigue, insomnia, and difficulty with concentration, the treating psychiatrist does not provide any current specific behavioral observation that speak to the presence, nature, or severity of a psychiatric impairment. The documentation reports impressions of a dysthymic mood and that [Ms. Lester] appears tired, but there were no elaborations on these impressions to support that [Ms. Lester] was impaired as a result. Notes from July–August 2018, the most recent psychiatric notes, report that [Ms. Lester] had been starting to feel better, trying to keep her apartment clean, spending more time with friends, and feeling optimistic. Her mood was reported to be stable. Due to the changeable nature of psychiatric disorders, and as [Ms. Lester] was in care, those notes do not likely represent her current functioning. Dr. Bhopal did not report any current mental status findings to document impairment in [Ms. Lester's psychiatric functioning.
>
> As a result, there are no current findings to support that [Ms. Lester] is impaired from a psychiatric perspective.

*Id.* Moreover, in response to "[d]o the medical records support that [Ms. Lester] be restricted or limited from performing activities such as their job duties in a different environment," Dr. Nie wrote "[a]s no current psychiatric impairment is supported, no restrictions or limitations are supported from a psychiatric perspective." *Id.*

As to Ms. Lester's cognitive impairment, Dr. Nie opined that "[i]ndividuals suffering from depression often report the perception that their cognitive functioning is impaired, although they are typically found to be unimpaired upon formal testing. In this case, there are no current formal mental examination findings to document the presence and severity of impairment in the [Ms. Lester's] memory specifically, or in her cognitive function generally." *Id.*

    b.  <u>Dr. Vikram Garg</u>

On October 9, 2018, Dr. Vikram Garg also submitted a review on Ms. Lester's medical records at the request of Liberty. Dr. Garg concluded that with regard to full-time sustained working capacity, there were "[n]o restrictions supported from an internal medicine perspective. Odgaard Decl., Ex. L. As to Ms. Lester's impairments, Dr. Garg noted that "[f]rom an internalist standpoint I do not find evidence that her diagnosis of hypovitaminosis D and asthma and anemia are severe enough to cause restriction with activity and exertion. Her asthma has been well

2

controlled. Her anemia is not severe enough to cause any restriction in cardiac or pulmonary function. [¶] As for her cognitive and mental health issues I would defer review of that to the appropriate specialist." *Id*. Additionally, "[t]he psychiatric and cognitive issues seem to be the primarily limiting conditions so assessment of that should be deferred to the appropriate specialist." *Id*.

Based on Dr. Nie and Mr. Garg's report, Liberty determined Ms. Lester was not disabled, and Roche terminated her LTD benefits.

### c. Dr. H. Daniel Blackwood, Ph.D

On appeal, Liberty retained Dr. H. Daniel Blackwood, Ph.D for review of Ms. Lester's medical records on February 6, 2019. Odgaard Decl., Ex. Q. Dr. Blackwood found the following:

> As of the date of this report, there is no support for impairment attributable to the presence of mental illness that would preclude [Ms. Lester] from carrying out her usual life activities, including work related activities, from October 1, 2018, forward. [Ms. Lester] is scheduled to undergo repeat neuropsychological examination in March 2019. The last neuropsychological examination was weak in terms of assessment of validity of performance, particularly since it was obviously not conducted in a disability context. Any neuropsychological examination conducted upon [Ms. Lester] will have to contain adequate measures of performance-validity and validity of symptoms-reporting in order to be useful in this context.
>
> . . . .
>
> The results of the neuropsychological examination reviewed below reflect significant variability in [Ms. Lester's] performance in various neurocognitive domains. She has exhibited specific difficulty in visual-spatial processing. I am not sure how this would translate into any specific functional impairment related to her job duties. Her general intelligence, memory, performances, and problem solving abilities are well within normal limits, although I cannot address the extent to which her performances represent any possible declines from historical levels of function. Dr. Canning renders no specific neurocognitive diagnosis, and I derive no specific diagnosis based upon the reviewed results. The performance-validity-assessment of the examination was weak, but I see no particular indications of lack of effort on the part of Ms. Lester. The results documented significant improvement with respect to depression/anxiety. These problems are apparently resolved.
>
> . . . .
>
> There is no current data supporting cognitive impairment for [Ms. Lester], the treating psychiatrist states that [Ms. Lester's] diagnosis

2

> of depression and generalized anxiety are being managed adequately, and the clinician specifically addressing neurological factors, Susan Sullivan, NP, has given no specific neurological diagnosis, so there is no basis for discussion with treating providers at this point.  Contact following updated neuropsychological examination might be helpful, along with review of records documenting the cognitive rehabilitation to which [Ms. Lester] refers in her declaration.

*Id*.  Dr. Blackwood also noted that, on November 6, 2018, Ms. Lester was administered the Montreal Cognitive Assessment, in which she scored 27 out of 30, which, according to Dr. Blackwood, is **within normal limits**.  *Id*.

    d.  Dr. Yong-Sung Chyun

   Liberty also hired Dr. Yong-Sung Chyun to review Ms. Lester's medical records for the appeal.  On February 15, 2019, Dr. Chyun reported that "from an internal medicine perspective, [there was] no impediment to full time work capacity . . . ."  Odgaard Decl., Ex. R.

    4.  Whether The Findings Were Arbitrary And Capricious

   Ms. Lester maintains that Liberty's reviewing doctors failed to credit her treating physicians' opinions as to her cognitive impairment.  Moreover, she also takes issue with Liberty's failure to conduct an in-person medical exam and failure to speak with all of her treating physicians.  Roche responds that:  (1) neither of Ms. Lester's treating physicians concluded that she was disabled under the terms of the Plan; (2) Ms. Lester's treating physicians opined that she could return to work with accommodations; and (3) the reviewing physicians' opinions were unbiased and based on a thorough review of Ms. Lester's medical records.

   As explained by the Supreme Court, "[p]lan administrators . . . may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician."  *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003).  However, "courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation."  *Id*.; *Gorbacheva v. Abbott Labs. Extended Disability Plan*, 794 F. App'x. 590, 593 (9th Cir. 2019) (no special weight to treating physicians).  In *Nord*, the Supreme Court distinguished ERISA benefit proceedings with Social Security disability benefit proceedings, the latter of which has "special

2

weight [] accorded [to] opinions of the claimant's treating physician." *Nord*, 538 U.S. at 825. The Court made this distinction because "[t]he treating physician rule . . . was originally developed by Courts of Appeals as a means to control disability determinations by administrative law judges under the Social Security Act." *Id*. at 829. But "ERISA was enacted to promote the interests of employees and their beneficiaries in employee benefit plans, and to protect contractually defined benefits," and "[n]othing in the Act itself . . . suggests that plan administrators must accord special deference to the opinions of treating physicians. Nor does the Act impose a heightened burden of explanation on administrators when they reject a treating physician's opinion." *Id*. at 830–31. Most importantly, according to the Supreme Court, the two Acts play different roles:

> The Social Security Act creates a nationwide benefits program funded by Federal Insurance Contributions Act payments and superintended by the Commissioner of Social Security. To cope with the more than 2.5 million claims for disability benefits [filed] each year, the Commissioner has published detailed regulations governing benefits adjudications. Presumptions employed in the Commissioner's regulations grow out of the need to administer a large benefits system efficiently. By accepting and codifying a treating physician rule, the Commissioner sought to serve that need. Along with other regulations, the treating physician rule works to foster uniformity and regularity in Social Security benefits determinations made in the first instance by a corps of administrative law judges.
>
> In contrast to the obligatory, nationwide Social Security program, [n]othing in ERISA requires employers to establish employee benefits plans. Nor does ERISA mandate what kind of benefits employers must provide if they choose to have such a plan. Rather, employers have large leeway to design disability and other welfare plans as they see fit. In determining entitlement to Social Security benefits, the adjudicator measures the claimant's condition against a uniform set of federal criteria. [T]he validity of a claim to benefits under an ERISA plan, on the other hand, is likely to turn, in large part, on the interpretation of terms in the plan at issue. It is the Secretary of Labor's view that ERISA is best served by preserv[ing] the greatest flexibility possible for . . . operating claims processing systems consistent with the prudent administration of a plan.

*Id*. at 833 (internal quotations and citations omitted) (alterations in original).

Thus, Dr. Canning and Dr. Bhopal's reports are not accorded any special deference, and the Court may ignore them in favor of the reviewing physicians' opinions if they are more persuasive. *Id*. at 834. In any event her doctors' reports are not clearly supportive of her claim of disability under the Plan. As discussed above, Dr. Canning's report contains opinions that are

2

1  inconsistent with a finding of disability.  It recommended that if Ms. Lester returns to her previous
2  position, "it should be on a paced schedule to gradually work back up to the demands of full time
3  employment after a 6-month leave."  Benham-Baker Decl., Ex. 4. at 7.  As to Dr. Bhopal, Roche
4  cites to a return-to-work release form signed by Dr. Bhopal dated December 19, 2017, in which
5  she stated that Ms. Lester could "[r]eturn on reduced schedule of 3 days/week for weeks 1 & 2,
6  then 4 days/week for weeks 3 & 4 then full time by week 5."  Odgaard Decl., Ex. T.  Roche also
7  provides the Court with a recommendation from Dr. Bhopal dated February 6, 2018, that
8  recommends a "return to work date of March 5, 2018" for Ms. Lester, and that "[i]t is
9  recommended that she be assigned a different role (business-oriented) either within or outside of
10 her current department."  These recommendations indicate that Ms. Lester was able to return to
11 work in some capacity.  Although Ms. Lester contends Roche refused to provide the suggested
12 accommodation, at best these doctors' reports are ambiguous as to whether Ms. Lester was so
13 severely impaired that she could not work without accommodations.  Neither Dr. Canning nor Dr.
14 Bhopal conclusively opines that Ms. Lester's cognitive impairment was so disabling that she could
15 not return to work in her previous role at Genentech.  Liberty's reviewers noted the absence of
16 such a finding.
17         The medical reviewers retained by Roche found the record supports a finding Ms. Lester
18 was not disabled from working her own occupation.  It is undisputed that Liberty hired—and, thus
19 paid—its medical reviewers.  Ms. Lester argues that the reports from these medical reviewers are
20 biased for this reason alone.  Ms. Lester has the burden of demonstrating that the medical
21 reviewers hired by Liberty are not independent.  *Demer*, 835 F.3d at 902 ("the party claiming a
22 conflict . . . [must] produce evidence of a financial conflict sufficient to warrant a degree of
23 skepticism.").
24         In support of her argument that Dr. Blackwood is biased, she cites to evidence that Dr.
25 Blackwood has reviewed approximately 1,000 claims for Liberty from September 1, 2017 to
26 February 13, 2020.  In *Demer*, the Ninth Circuit concluded that the claimant satisfied his burden in
27 showing bias based on evidence that the reviewing doctor "earned a substantial amount of money
28 from MetLife ($125,000–$175,000 each year) and have performed a substantial number of

1   reviews for the company as well (200–300 reviews/addendums each year)." *Id*. Here, assuming
2   Dr. Blackwood reviewed the same number of claims for Liberty each year from late 2017 through
3   early 2020, that would equate to well over 300 reviews per year. This is more than the reviews
4   found by the *Demer* court that warranted skepticism. Thus, this Court finds that Ms. Lester, like
5   the claimant in *Demer*, has met her burden of production in showing that Dr. Blackwood has at
6   least some degree of financial conflict. This Court will therefore weigh Dr. Blackwood's report
7   with skepticism.

8   However, Ms. Lester has not provided the same type of evidence for the remaining file
9   reviewers (*e.g.*, Drs. Nie, Garg, or Chyun). Indeed, Ms. Lester simply states that "Dr. Nie
10  demonstrated her bias by utilizing the typical methodology of hired reviewers and seeing a
11  vacation, yoga, and mediation as indications of ability to work." This is too conclusory of an
12  assertion to demonstrate that Dr. Nie (or any other reviewer) was so biased against Ms. Lester
13  such that her opinions deserve no credence. Moreover, at the hearing, counsel for Ms. Lester
14  indicated that there was nothing in the record to support a finding of bias against any reviewer
15  other than Dr. Blackwood.

16  Ms. Lester also argues that Liberty's reviewing physicians should be discredited because
17  they did not meet with her for an in-person examination, and because they did not call each of Ms.
18  Lester's treating physicians. Liberty does not dispute that its doctors only examined the medical
19  records rather than meeting with Ms. Lester in person. While it is true that an in-person
20  examination may be more reliable than a paper review—especially for a disability such as
21  cognitive impairment—a lack of an independent, in-person examination does not render that
22  reviewer's report unreasonable *per se*. *See Broyles v. A.U.L. Corp. Long-Term Disability Ins.*
23  *Plan*, 2009 WL 3817935, at *6 (N.D. Cal. Nov. 12, 2009), *aff'd*, 408 F. App'x 67 (9th Cir. 2011)
24  ("ERISA does not require a plan administrator to obtain an independent medical examination, and
25  consulting physicians' opinions based on reviews of medical records are an acceptable basis of an
26  administrator's determination."); *Montour*, 588 F.3d at, 630 ("whether the plan administrator
27  subjected the claimant to an in-person medical evaluation or relied instead on a paper review of
28  the claimant's existing medical records" is only one factor to be considered); *Demer*, 835 F.3d at

1   906 (scrutinizing, under a totality of circumstances test, a doctor's paper-only review of the
2   claimant's credibility).
3     In toto, the Court finds that Roche did not abuse its discretion.  Liberty's finding that Ms.
4   Lester's cognitive impairment was not a disability under the Plan was not "(1) illogical, (2)
5   implausible, or (3) without support in inferences that may be drawn from the facts of the record."
6   *Salomaa*, 642 F.3d at 676 (quoting *Hinkson*, 585 F.3d at 1262).  Specifically, the Court finds Dr.
7   Nie's review of Ms. Lester's medical records was reasonable and thorough.  *See* Odgaard Decl.,
8   Ex. M.  Unlike Dr. Canning, Dr. Nie's evaluation did a comparison of Ms. Lester's cognitive
9   ability with her job duties.  *Id*. at ROCHE000297.  Dr. Nie also considered Ms. Lester's medical
10  records beginning from the onset of her disability in September 7, 2017, and these records came in
11  the form of progress reports/notes, work status reports, provider statements, functional capacity
12  evaluations, etc.—all of which were from Ms. Lester's treating physicians.[4]  Moreover, Dr. Nie
13  had a peer-to-peer call with Dr. Bhopal.  *Id*. at ROCHE000300.  While Dr. Nie did not call Dr.
14  Canning, the Court finds this to be a *de minimus* omission because Dr. Canning did not have a
15  history of treating Ms. Lester—Dr. Canning only evaluated her once in February 2018.
16    While this Court need only find one medical opinion supports Roche's decision to
17  terminate benefits in order to conclude that its decision was not an abuse of discretion (*see*
18  *Montour*, 588 F.3d at 629), the record contains other evidence concluding that Ms. Lester was able
19  to return to work.   Dr. Chyun and Vikram Garg opined in their respective fields of expertise in
20  internal medicine that Ms. Lester's diagnosis did not support an impediment or restriction to work
21  full time.  *See* Odgaard Decl., Exs. L & R.  Most notably, Liberty's determination is supported by
22  Dr. Blackwood's report of Ms. Lester's strong score (*i.e.*, 27/30) on the Montreal Cognitive
23  Assessment; that score would appear to be to be more probative of her cognitive ability at the time
24  of the termination of her benefits, because it was the closer-in-time assessment than Dr. Canning's
25  February 2018 evaluation.  While counsel for Ms. Lester argued at the hearing that this assessment
26  did not supersede Dr. Canning's February 2018 report, counsel did not otherwise offer any

---

[4] These doctor notes are not contained within the record.

argument as to why this November 2018 assessment should be less probative of Ms. Lester's cognitive status at the time of the cessation of her LTD benefits (*i.e.*, October 2018). Indeed, both parties conceded at the hearing that this Montreal Cognitive Assessment is used to do just that— measure cognitive ability.

A further consideration providing support for Liberty's determination is Ms. Lester's job applications to a chief-of-staff position at Genentech and a role in Genentech's parent company's (*i.e.*, Roche) Switzerland office to be probative of her ability to return to work. While the record does not contain the job description for these roles, the chief-of-staff position's title, alone, suggests that it requires a high level of basic cognitive functions not consistent with Ms. Lester's claims of disability. To be sure, this fact alone provides weak probative value given there is nothing in the record specific about the nature of the position sought, and those on disability leave should not be discouraged or penalized for trying to find employment. But this evidence is not entirely irrelevant and tends to corroborate (though only slightly so) the medical evidence in the record supporting Liberty's finding.

Finally, as noted above, the reviewer's findings are not squarely contradicted by Ms. Lester's doctors' reports: two of Ms. Lester's physicians opined that she could return to her regular, pre-disability job with accommodation (*i.e.*, a shorter workweek that gradually progressed into full-time employment). Although Ms. Lester points out that Roche did not accommodate her, the accommodations were temporal in nature and did not suggest a long-term inability to work without accommodations.

In support of her claim of disability, Ms. Lester cites to *Spears v. Liberty Life Assurance Company of Boston*, 2019 WL 4766253 (D. Conn, Sept. 30, 2019) as an instructive case because it involved the same plan administrator here, *i.e.*, Liberty, and the disability at issue was also cognitive impairment. But as Roche correctly point out, the similarities end there. While Ms. Lester cites *Spears* for the proposition that Liberty's lack of a global assessment was "disturbing," the district court made this finding (1) on a *de novo* standard; (2) after concluding there was a structural conflict because Liberty paid the LTD benefits claims ***and*** was the plan administrator; (3) the reviewing physicians asked biased questions; and (4) the reviewing physicians participated

2

in a conference call to discuss the claimant's disability. *Id*. at 38–40. These facts are not present on this record.

## V. CONCLUSION

Ms. Lester has failed to demonstrate by a preponderance of the evidence that Roche's decision to terminate her benefits in October 2018 was an abuse of discretion or that was it "(1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from the facts of the record." *Salomaa*, 642 F.3d at 676. Instead, the decision was grounded on a reasonable basis. *See Montour,* 588 F.3d at 629. Accordingly, Ms. Lester's motion for judgment is **DENIED**, and Roche's motion for judgment is **GRANTED**.

This order disposes of Docket Nos. 38 and 39.

**IT IS SO ORDERED**.

Dated: June 23, 2020

_____
EDWARD M. CHEN
United States District Judge

2